Joseph G. Sansone
Co-Chief, Market Abuse Unit
Simona K. Suh
Barry P. O'Connell
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
Brookfield Place
200 Vesey Street, Suite 400
New York, NY 10281
(212) 336-0103 (Suh)
Email: suhs@sec.gov

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | |
| Plaintiff, | 16-CV-09403-KM-JBC |
| -against- | <u>AMENDED COMPLAINT</u> |
| NARIS CHAMROONRAT, YANIV AVNON, RAN ARMON, G SIX TRADING Y.R LTD., and ADAM L. PLUMER, | JURY TRIAL DEMANDED |
| Defendants, | |
| -and- | |
| NKO HOLDINGS CO. LTD., | |
| Relief Defendant. | |

Plaintiff Securities and Exchange Commission ("Commission" or "SEC") files this Amended Complaint against Defendants Naris Chamroonrat ("Chamroonrat") (who, upon information and belief, resides at 889-171 Rama 3 Road, Bang Pong Pang, Yannawa 10120, Bangkok, Thailand); Yaniv Avnon ("Avnon") (who, upon information and belief, resides at Derech Hayam 65, Haifa, Israel); Ran Armon ("Armon") (who, upon information and belief, resides at 130 Lisa Crescent, Thornhill, Ontario, Canada); G Six Trading Y.R Ltd ("G6") (which,

upon information and belief, has its headquarters at Derech Hayam 65, Haifa, Israel); and Adam

L. Plumer ("Plumer") (who, upon information and belief, resides at 3401 Graceful Orchid Street,

Las Vegas, Nevada 89117) (together, "Defendants"); and Relief Defendant NKO Holdings Co.

Ltd. ("NKO") (which, upon information and belief, has its registered office at 582-592 Nathan

Road, Mongkok, Kowloon, Hong Kong), and alleges as follows:

<u>SUMMARY</u>

1.      Between 2013 and 2015, Defendants Chamroonrat, Avnon, Armon, G6, and

Plumer defrauded hundreds of investors worldwide by soliciting these investors to trade

securities through the purported "day trading" firm Nonko Trading ("Nonko"), arranging for the

investors to deposit funds with Nonko, providing investors with phony trading accounts, and

absconding with the funds that the investors had deposited.  Defendants misappropriated at least

$1.4 million of investor funds.

2.      Chamroonrat, Avnon, Armon, G6, and Plumer lured investors to day-trade

through Nonko with promises of generous leverage, low trading commissions, and low minimum

deposit requirements.  When investors sent funds to Nonko and proceeded to place trade orders,

however, the trade orders were never routed to the markets.  Instead, Chamroonrat, acting

together with Avnon and Armon, as well as Armon's entity G6, simply stole the investors'

money, using it, among other things, to fund their personal expenses, to pay Plumer and other

associates, and to make Ponzi-like payments to those investors who asked to close their Nonko

accounts.

3.      To conceal and perpetuate the theft, Defendants provided the investors with

access to training accounts that closely resembled live trading accounts and appeared to allow the

investors to place and execute securities trades on multiple venues, including securities

exchanges located in the United States.  Contrary to Defendants' representations and investors' expectations, the training accounts merely simulated the execution of trades and the creation of securities positions, without ever submitting trades to market venues.  As the scheme progressed, Defendants moved the investors they were defrauding from the training accounts to Logix Trader ("Logix"), a phony trading platform that Chamroonrat and Avnon conceived and developed with other associates.  Defendants falsely touted Logix to investors as a superior trading platform. Just like the training accounts, the Logix platform only simulated trades and positions without sending any trade orders to the markets for execution.

4.      Avnon, Armon, and G6 (a business that Avnon and Armon operated providing training in securities trading) played a central role in the scheme, by, among other things, soliciting traders for the scheme under G6's name, in exchange for a portion of the fraud's proceeds.

5.      The Nonko fraud resulted in at least $1.4 million in net losses to over 260 investors, residing in over 30 countries worldwide.  The fraud's victims included at least 180 investors from the United States, who collectively lost nearly $1 million to the fraud.

6.      Starting in late 2014, Defendants directed fraud victims to send their funds to an account in the name of Relief Defendant NKO.  Victims of the Nonko fraud sent at least $439,000 in deposits to NKO's account, and lost at least $320,000 of those funds.

7.      Defendants also violated the United States broker-dealer registration requirements, by operating Nonko as a broker without registering with the Commission.

## VIOLATIONS

8.      By virtue of the conduct alleged herein, Chamroonrat, Avnon, Armon, G6, and Plumer each violated and aided and abetted violations of Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)] and Sections 10(b) and 15(a)(1) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78j(b), 78o(a)(1)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and also violated Section 20(b) of the Exchange Act [15 U.S.C. § 78t(b)], by committing the Exchange Act violations through or by means of other persons.

9.      Unless Chamroonrat, Avnon, Armon, G6 and Plumer are permanently restrained and enjoined, they will again engage in the acts, practices and courses of business set forth in this Amended Complaint and in acts, practices and courses of business of similar type and object.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

10.     The Commission brings this action under the authority conferred upon it by Sections 20(b) and (d) of the Securities Act [15 U.S.C. § 77t(b), (d)], and Sections 21(d)(1), (3) and (5) of the Exchange Act [15 U.S.C. §§ 78u(d)(1), (3), (5)].   The Commission seeks a final judgment: (a) permanently restraining and enjoining each Defendant from engaging in the acts, practices and courses of business alleged herein; (b) requiring each Defendant to disgorge ill-gotten gains and to pay prejudgment interest thereon, on a joint and several basis with each other and with Relief Defendant NKO (up to the amount of ill-gotten gains it received, plus prejudgment interest thereon); and (c) imposing civil money penalties on each Defendant pursuant to Sections 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

## JURISDICTION AND VENUE

11.    This Court has jurisdiction over this action pursuant to Sections 22(a) of the

Securities Act and 27 of the Exchange Act [15 U.S.C. §§ 77v(a), 78aa].

12.    Venue lies in this District pursuant to Sections 22(a) of the Securities Act and 27

of the Exchange Act [15 U.S.C. §§ 77v(a), 78aa].  Some of the acts, practices, courses of

business and transactions constituting the violations alleged herein occurred within the District of

New Jersey.  Among other things, many of the fictitious securities transactions reported to the

victims of the Nonko fraud were generated via a server located in the District of New Jersey.

The Logix simulator relied on a market data stream provided by a New Jersey-headquartered

vendor, retained for the scheme by Defendants.  In addition, multiple residents of the District of

New Jersey were among the victims of the fraud.  From the District of New Jersey, these victims

submitted to Nonko securities trade orders that the victims believed were real but in fact were

never sent to or executed in the market.

## DEFENDANTS

13.    **Chamroonrat**, age 33, is a dual citizen of the U.S. and Thailand and resides in

Bangkok, Thailand.  From at least 2013 through at least 2015, Chamroonrat was in charge of all

aspects of Nonko's operations and communications to investors and had the ultimate authority

over Nonko's written and other representations to investors, including the representations that

Nonko made on its website, in social media, and in trader agreements.

14.    **Avnon**, age 36, is a citizen of Israel and, upon information and belief, resides in

Haifa, Israel.  At all relevant times, Avnon was sole shareholder and sole director of Defendant

G6, an online business providing training in securities trading, which Avnon operated with

Defendant Armon.  Together with Armon, Avnon used G6 to solicit investors for Nonko.  From

at least November 2013, Armon was also, in substance, Chamroonrat's second-in-command at Nonko, working closely with Chamroonrat on all aspects of Nonko's operations.

15.     **Armon**, age 45, is, upon information and belief, a resident of Thornhill, Ontario, Canada.  From at least 2013 and through at least 2015, Armon**,** together with Avnon, operated Defendant G6 and used it to solicit investors for Nonko.

16.     **G6** is an Israeli corporation with headquarters in Haifa, Israel, wholly owned by Avnon.  From at least 2013 and through at least 2015, Avnon, together with Armon, operated G6 as an online business providing training in securities trading and used it to solicit investors for Nonko.

17.     **Plumer**, age 27, resides in Las Vegas, Nevada.  In early 2014, Chamroonrat recruited Plumer to work for Nonko, and Plumer subsequently conducted Nonko's business on Chamroonrat's behalf, including, for a time, out of a Chamroonrat-funded rental office space in Las Vegas, Nevada.

## RELIEF DEFENDANT

18.     **NKO** is a Hong Kong corporation with its registered office in Hong Kong, China.  At all times, Chamroonrat controlled NKO.  Starting in late 2014, NKO's bank account in the Cook Islands was used to receive investor deposits that were obtained as part of the Nonko fraud.

## RELEVANT BUSINESSES AND ENTITY

19.     **Nonko** was the business name under which Defendants and their associates carried out their fraud.  Nonko was not a legal entity.

20.     **Nonko Group, LLC** was a limited liability company formed under the laws of Nevis and controlled by Chamroonrat as its sole owner and officer.  From 2013 and until late

2014, Defendants used this entity's bank account in Belize to receive investor deposits and conduct Nonko's operations.

21.     **Logix Trader** or **Logix** was a trading simulator program that Defendants and their Nonko associates provided to Nonko's customers starting in September 2014.  Defendants falsely represented to customers that the program was a live electronic trading platform for trading securities in the United States markets, including on various United States securities exchanges.

FACTS

A.     **Nonko's Training Accounts Scheme**

22.     Starting in at least 2013, Chamroonrat operated Nonko as a purported proprietary trading firm for investors seeking to engage in electronic day-trading in the United States securities markets.

23.     To attract day-traders, Chamroonrat, through Nonko, offered terms that were not available at any SEC-registered broker-dealer in the United States, including a minimum deposit of only $2,500 (and occasionally lower), as well as leverage (or margin) of 20:1 (that is, purporting to give traders the ability to trade $20 of total capital for each dollar deposited).  Such low account balances and high leverage ratios are prohibited for many day traders in the United States under FINRA's rules applicable to certain day-trading accounts.

24.     Nonko also attracted day traders with cheap commissions.  Initially, in early 2013, Nonko charged its traders both per-trade commissions and a share of their net profits.  But by mid-2013, Nonko abandoned profit splits and, during the rest of the relevant time, only charged its traders commissions, generally at or below $0.006 per share.

7

25.     By late 2013, Avnon had become Chamroonrat's close associate at Nonko. Avnon assisted Chamroonrat in operating Nonko and also, together with Armon, used G6, a business providing training in securities trading, to solicit investors for Nonko.

26.     Chamroonrat, together with Avnon and other associates, conceived of the training accounts scheme in late 2013.  At that time, Nonko's customers had access to live accounts set up on an electronic securities trading platform ("Platform A").  As is common in electronic securities trading, Platform A had a training account module, typically provided to new users of the software, so that they could become familiar with its features in a simulated trading environment.  These training accounts on Platform A accessed a trading simulator program that was not programmed to send the users' "orders" to any market centers for execution, but simply generated records of potential, or simulated, "executions" of the orders, based on then-current market prices for the securities in question.

27.     By secretly providing some of Nonko's customers with training accounts instead of real ones, Defendants were able to misappropriate customers' trading deposits without detection.  In Skype chats and emails, Chamroonrat and Avnon referred to the scheme as their "TRZ program," named after the prefix "TRZ" that all of Nonko's training accounts were assigned on Platform A.  To ensure the scheme's success, from the outset, Chamroonrat, Avnon, and Armon targeted traders who appeared inexperienced or unsophisticated, or had a history of trading losses, as these traders appeared likely to place losing trades in the future and thus were unlikely to ask to withdraw funds from their accounts.

28.     In January 2014, Chamroonrat recruited Plumer to join the Nonko scheme, and, for approximately a year and a half thereafter, Plumer helped Chamroonrat operate Nonko by, among other things, answering routine inquiries from traders by email, chat, or telephone;

8

drafting Nonko's marketing materials and trading agreements; cold-calling potential customers from leads lists provided to him by Avnon and Armon; and communicating on Nonko's behalf with existing and potential marketing affiliates that, as alleged in greater detail below, referred traders to Nonko in exchange for a portion of those traders' commissions. For part of the time, Plumer conducted Nonko's business out of an office space that Chamroonrat had rented in Las Vegas, Nevada.

29.     As part of Plumer's "orientation" at Nonko in January 2014, Chamroonrat emailed Plumer written "TRZ Guidelines," a document that set forth the guidelines on which traders should be selected for the fraudulent TRZ program (novices and those with a history of trading losses), and on what to say if traders questioned any "anomalies" in their fictitious trade "executions." The suggested explanations listed in the document included "alternative routing," "internaliz[ation] by a wholesale desk," and the fact that "the ECN [electronic communications network] they [the customers] are using is a dark pool." Both Chamroonrat and Plumer knew that these explanations were pure fiction, as were all trade "executions" reported to Nonko customers who were given TRZ accounts.

30.     In subsequent Skype chats, Chamroonrat, Avnon, Plumer, and other Nonko associates sometimes discussed whether a particular trader was "TRZ valid," based on whether they thought the trader would likely place losing trades. When the Nonko team determined that a particular trader was too successful for the fake accounts scheme and might demand to withdraw funds, Nonko often provided that trader with a real account, with the prefix "NTRD."

31.     For example, on or about February 3, 2014, in a Skype chat with Chamroonrat, Plumer stated that the "thing with TRZ that freaks me out... THE ONLY THING ... someone [...] will make money [....] what happens when they do make money?" Chamroonrat responded:

"bump them off trz, put them on a real account give them more leverage in exchange for a profit split."

32.     In another example, on or about February 12, 2014, Avnon emailed Chamroonrat to alert him that one of Nonko's TRZ traders recently generated a fictional "profit." After summarizing the trader's history, Avnon inquired of Chamroonrat:  "Are we close him [sic], and move him to NTRD? or we wait in patient [sic] for him to lose it all back like he did in the past." After some further discussion, Chamroonrat suggested lifting some of the system's limitations on the customer's activity and "offering [the customer] more shares and bp [buying power], get him to lose more faster."

**B.     Development and Deployment of the Logix Trading Simulator**

33.     In late February 2014, Avnon suggested to Chamroonrat that, instead of paying for licensing third-party trading software associated with Platform A, Nonko develop its own software for the training accounts scheme.  In a Skype chat with Chamroonrat, Avnon explained that, in reality, Nonko's "trading platform" would not be a real platform, but instead would be "just a website with an engine who [sic] gets the quotes from Reuters or other providers, [and] you put Sell Buy buttons."  Comparing Nonko's TRZ program to a gambling website, Avnon suggested that "[w]e can be better than that[;] we just need the TRZ not to show it's a TRZ."

34.     Soon thereafter, Chamroonrat and Avnon implemented this idea by retaining a programmer to develop what became known as "Logix" – a web-based program that Nonko would tout as its proprietary trading platform.  In reality, Logix was merely a trading simulator, or, in Avnon's words, a website with "Buy" and "Sell" buttons that received market data from a third-party vendor.

35.    Unexpected events in late August 2014 accelerated Nonko's move to Logix.  One of Nonko's TRZ customers made an inquiry to Platform A's technical support staff, and, in the course of that discussion, it became clear to the operators of Platform A that the customer wrongly believed that his training account was a live one.  On August 29, 2014, the firm that owned Platform A sent out an email blast to all Nonko customers alerting them that accounts starting with "TR" were training accounts; the firm then discontinued its relationship with Nonko, accusing Nonko of deceiving its customers.

36.    After learning of the actions taken by Platform A's owner, Chamroonrat quickly developed a plan for continuing the training accounts scheme.  Chamroonrat instructed Avnon, Armon, Plumer, and other associates to categorically deny the allegations of Platform A's owner and to tell customers that Nonko was ending its relationship with Platform A because of poor communication and repeated technical glitches.  Chamroonrat also instructed the team to move all Nonko customers from Platform A to Logix, which, at that time, was in the testing phase of development.

37.    In the following days, Chamroonrat, Avnon, Armon, and Plumer, with the help of their other Nonko associates, implemented Chamroonrat's plan and moved most of Nonko's TRZ traders to Logix.  The Nonko team told traders that Nonko was moving to Logix, Nonko's "proprietary trading system," because of its technological superiority over Platform A.  When questioned about the allegations made by Platform A's owner, the Nonko team claimed that those allegations resulted from a misunderstanding.  Although some customers did leave Nonko at that time, most continued to use Nonko because of its low commission rates and high leverage ratios.

38.     From September 2014 through at least the summer of 2015, Nonko's fraudulent scheme thus continued to operate largely in the same manner as before, with the Logix simulator serving as its purported trading platform.  During this time period, only a handful of Nonko customers received access to real securities trading capabilities.  All the other traders received trading simulator accounts, now with the prefix NKO, operated by Logix.

39.     During this period, Defendants and their Nonko associates continued to aggressively market Nonko through social media, online advertising, the marketing affiliate program, and various incentives programs.  For example, on or about November 4, 2014, Avnon sent out an email blast to former Nonko customers, informing them that "for every person you refer to Nonko that becomes a member, you will receive 3 months platform for free."

40.     Overall, between late 2013 and 2015, Nonko's training accounts scheme attracted at least $1.6 million in deposits from over 260 investors based in over 30 countries worldwide. Although some of the investors received some funds back, the vast majority did not recoup their deposits, and the investors suffered total losses of at least $1.4 million.  Nearly 70 percent of these losses were suffered by over 180 investors based in the United States.

41.     Starting in late 2014, Defendants and their Nonko associates directed Nonko customers to send their trading deposits to a bank account in the name of Relief Defendant NKO in the Cook Islands.

42.     Victims of the fake accounts scheme sent at least $439,000 in deposits to NKO's account and lost at least $320,000 of those deposits to the fraud.

C.      **Defendants' False Statements to Investors and Roles in the Fraud**

43.      At all relevant times, <u>Chamroonrat</u> was the head of Nonko.  He established and controlled the Nonko-associated corporate entities (including Nonko Group, LLC, and Relief Defendant NKO); established and controlled the bank accounts that were used in the scheme; established and paid for website hosting and telephone services used in the scheme; and, in communications with investors and affiliates, held himself out as the head of Nonko. Chamroonrat made all business decisions for Nonko, and his Nonko associates (including Avnon, Armon, and Plumer) sought his approval for all non-ministerial matters related to Nonko's operations.

44.      In his role as the head of Nonko, Chamroonrat had the ultimate authority over the content of Nonko's website and other marketing materials, its agreements with traders, and other written representations that Nonko made to investors.  These written materials routinely included material misrepresentations and materially misleading omissions.

45.      For example, on its website, Nonko claimed to offer "state-of-the-art online stock trading infrastructure, designed to meet the exacting requirements of demanding day trading professionals" and "the ability to trade a wide range of US stocks and options from a single trading platform" – all without disclosing that most of its business consisted of providing traders with training accounts and pocketing their deposits.

46.      In its agreements with traders (including those executed by victims of Nonko's training accounts scheme), Nonko stated that each Nonko customer would "select purchases and sales of securities ('Stock Trades') for day-trades in [his or her] Trader Sub-Account" and discussed account balances, commission rates, trading venue and other trading fees, and other

terms of the arrangement as if it was an arrangement for real securities trading, and without disclosing that the "trading" would, in fact, be fictitious.

47.     After the move to Logix, Nonko's website described Logix as "one of the world's advanced stock trading platforms" that "provides powerful, lightweight access to multiple US equity and derivatives markets."   In reality, Logix was merely a trading simulator program, not capable of sending any orders for execution to any market centers.

48.     Chamroonrat also represented Nonko, as its head, in discussions with actual and potential marketing affiliates and investors, and, in those interactions, represented Nonko as a real day-trading business, without disclosing that, in reality, most of the "trading" conducted by Nonko's customers was fictitious.  One such meeting, with an individual who ran online trading courses, took place in Tennessee on or about November 23, 2014.

49.     Chamroonrat also directed the material misrepresentations that his Nonko associates made to investors on Nonko's behalf, including in such communications as emails announcing the activation of the investors' "live" trading accounts (which, in fact, were training accounts and not "live" at all); emails announcing the move to Logix as a purportedly superior trading platform (in fact, a simulator program); and emails requesting that investors send additional funds to Nonko when their accounts were disabled due to low balances, without disclosing that the accounts were depleted not through trading losses but through Nonko's theft of investor funds.

50.     At all relevant times, Chamroonrat knew, or was reckless in not knowing, that Nonko's statements to investors outlined above were materially false or misleading. Chamroonrat also knew, or was reckless in not knowing, that Nonko's customers were led to believe and did believe that their accounts were real trading accounts.

51.      Beginning in at least November 2013, Avnon was, in substance, Chamroonrat's second-in-command at Nonko.  Avnon worked closely with Chamroonrat on all aspects of Nonko's business, including setting up and operating Nonko's accounting and back office systems, managing inquiries from traders, negotiating with traders, marketing affiliates, and vendors, and framing Nonko's marketing strategy.  Avnon also handled a substantial portion of customer communications, often under the name of G6, the online trader training business that he owned and used, together with Armon, to solicit investors for Nonko.

52.      Avnon made numerous direct misrepresentations to Nonko investors, including those residing in the United States.  These misrepresentations included email announcements, sent on or about August 31, 2014, of Nonko's move from Platform A to Logix, which falsely described Logix as a real trading platform and falsely attributed the move to poor communication and service from Platform A.  Avnon's direct misrepresentations also included numerous email announcements to individual traders (including those sent on or about August 16 and October 15, 2014) concerning the funding and opening of "live" accounts, which were in fact not live.

53.      On or about November 25, 2014, when pressed by a former TRZ customer in an email for "proof" that the customer's "account was real and not demo account," Avnon responded, in relevant part: "We guarantee you the account was real.  everything you traded was real, if you lost than [sic] you lost to the market[.] If you made a profit and it's still in your account you can claim it."

54.      At all relevant times, Avnon knew, or was reckless in not knowing, that his statements to investors outlined above were materially false or misleading.  Avnon also knew, or was reckless in not knowing, that Nonko's customers were led to believe and did believe that their accounts were real trading accounts.

55.     Armon, a core member of the Nonko team, solicited investors for Nonko through G6; provided marketing leads lists for Plumer and Nonko's marketing affiliates to pursue; met with and solicited marketing affiliates on Nonko's behalf; participated in the testing of the Logix program during its development in the summer of 2014; and operated Nonko's main physical office, out of an office building in the suburbs of Toronto.  Armon also provided materially false or misleading responses to some of Nonko customers' technical inquiries about Logix, without disclosing that the "platform" was a mere simulator.  For example, on or about September 1, 2014, immediately after the move from Platform A to Logix, Armon assured one of Nonko's U.S.-based TRZ customers that the email from Platform A's owner resulted from a "misunderstanding"; that the investor's money was "100% safe"; and that Nonko was moving to its own "new platform (LOGIX)" – all without disclosing that the new "platform" was a mere simulator, and that the allegation made by the owner of Platform A was true.

56.     In another example, on or about November 20, 2014, one U.S.-based Nonko customer reached out to Armon with an urgent request to unlock his then locked Logix account, stating, "I have a couple positions open right now and I have to go!!"  Without disclosing that the "positions" were fictional and generated by a trading simulator, Armon responded, "do u want us to sell the positions for you?"   The user responded, "You're killing me!!  I guess so since I can't log in.  Sell everything."  Shortly thereafter, Armon reported to the user, "Done" – again, without disclosing that the "trades" were simulated.

57.     At all relevant times, Armon knew, or was reckless in not knowing, that his statements to investors outlined above were materially false or misleading.  Armon also knew, or was reckless in not knowing, that Nonko's customers were led to believe and did believe that their accounts were real trading accounts.

16

58.     G6 was the most significant marketing affiliate of Nonko, operating in substance as Nonko's training and marketing division.  G6 offered securities trading seminars and training materials and also solicited traders to open accounts with Nonko, touting Nonko's purportedly superior contract terms and trading capabilities, without disclosing that most of Nonko's customers had training accounts and did not execute any real trades.  Indeed, many of the victims of the training accounts scheme were introduced to Nonko by G6, and it was G6 that provided them with the instructions for executing Nonko's trading agreement and for sending funds to Nonko.

59.     As the sole owner and director of G6, Avnon had the ultimate authority over the statements made to investors in G6's name.   At all relevant times, Avnon knew or was reckless in not knowing that G6's statements to investors about Nonko were materially false or misleading.

60.     Plumer, while subordinate to Chamroonrat, Avnon, and Armon, also made multiple material misrepresentations to investors.  Among other things, Plumer reached out to potential customers by phone and email and solicited them to "trade" through Nonko.  He also routinely responded to potential and existing customers' inquiries about Nonko, its commission rates, its technology, and other aspects of Nonko's operations.  In all these discussions, Plumer presented Nonko as a real trading business and did not disclose that most of Nonko's customers were unwitting users of a trading simulator program, rather than of a real trading platform.

61.     For example, on or about April 4, 2014, Plumer received an email from a trader who asked about Plumer's thoughts on Nonko.  Plumer responded, "The guys at Nonko are solid, it is a really large firm."  At that time, Plumer knew that Nonko was, in fact, misappropriating investor funds through the training accounts scheme.  On or about May 6, 2014, that trader sent

$2,100 to Nonko's Belize account, and soon after that he was assigned a training "TRZ" account. The trader ultimately lost $1,273 to the Nonko fraud.

62.     At all relevant times, Plumer knew, or was reckless in not knowing, that his statements to investors outlined above were materially false or misleading.  Plumer also knew, or was reckless in not knowing, that Nonko's customers were led to believe and did believe that their accounts were real trading accounts.

**D.      Nonko's Unregistered Brokerage Operations**

63.     Although Nonko held itself out as a proprietary trading firm, in substance, it operated as a broker, processing fictitious, and in some instances real, securities transactions for customer accounts.  None of Nonko, Chamroonrat, Avnon, Armon, G6, Plumer, or any of their other Nonko associates was registered with the Commission as a broker-dealer.

64.     To solicit investors for Nonko, Chamroonrat and his Nonko associates, including Avnon, Armon, and Plumer, used online advertising, social media, individual outreach, and various incentives programs.  Through social media and on Nonko's website (which, until at least July 2015, was freely accessible from the United States), Nonko touted its customers' "ability to trade a wide range of US stocks and options from a single trading platform," as well as its purportedly generous leverage and per-trade commission terms and purportedly great customer service.

65.     Nonko also maintained lists of investor names, or marketing leads, compiled from various sources.  Avnon and Armon routinely distributed such lists to Plumer for follow-up, and Plumer, as well as other Nonko associates, routinely reached out to individuals on these lists, by telephone or by email, to invite them to trade through Nonko.  Many of the investors targeted in this manner resided in United States.

66.     Central to Chamroonrat's and Avnon's marketing strategy for Nonko was Nonko's affiliate program.  Chamroonrat and Avnon, either directly or through Armon, Plumer, and other associates, pursued relationships with providers of online trader chatrooms, seminars, training courses, or other online services related to securities day-trading in the United States. These individuals or businesses were then invited to refer traders to Nonko in exchange for a portion of the referred traders' commissions, payments that were referred to as commission "overrides."

67.     Many of Nonko's marketing affiliates were based in the United States.  For example, one such marketing affiliate, a Tennessee-based provider of online trader courses, referred many of his students to Nonko in 2014 and 2015, in exchange for commission overrides of $0.002-$0.003 per share, out of the $0.006 per share that his referred students paid to Nonko.

68.     Once a trader signed Nonko's trading agreement and wired to Nonko his or her initial deposit, Nonko provided the trader with access to its trading technology and created a trader-specific subaccount in its back office system.  Nonko would allocate the trader's initial deposit to that subaccount, and, once the trader began using Nonko's trading technology, would use the subaccount to track the trader's performance (real or fictitious), allocating to the subaccount any of the trader's profits or losses, net of commissions, monthly trading platform fees, and any third-party trading fees, whether real or fictitious.  If the subaccount balance fell below a certain threshold (generally, $500), Nonko would disable the trader's access to its trading platform until the trader deposited additional funds.

69.     To the extent that Nonko provided its traders with real – rather than fictitious – access to the securities markets, it did so through a relationship with an offshore trading firm for which Chamroonrat had worked prior to launching Nonko ("Firm A"), and a chain of

master/subaccount relationships.  Once a trader's subaccount was funded and the trader received access to Nonko's trading technology, the trader would be able to place trades through Firm A's master account at another offshore trading firm.  In the master account, the trader's transactions would be commingled with those of other Nonko customers, as well as with transactions of any direct customers of Firm A.  Thus, from the offshore trading firm's perspective, all these transactions would be treated as Firm A's transactions.  The offshore trading firm, in turn, would use its own back office system to separately track Firm A's trading activity and account balance, but, for trade execution purposes, would commingle all of Firm A's transactions with those of its other customers, in its own "master" account held at a U.S. clearing broker registered with the Commission.

70.     Nonko's business was at all times focused on trading securities (whether fictitious or real) in the United States securities markets, and its target customer base consisted largely of United States residents.  For example, in its marketing materials, Nonko touted its "real-time access to a wide range of US exchanges," "reliable real-time access to multiple US markets, including both equities and derivatives," and its "access to a wide range of US asset classes."  In its agreements with traders, Nonko routinely included instructions for wiring funds from U.S. banks, instructed customers to send only U.S. Dollar-denominated deposits, and listed a schedule of fees and rebates to be charged by various U.S. securities exchanges.  No non-U.S. trading venues were referenced.  Moreover, both the fictitious and the real transactions executed for Nonko's customers routinely included transactions in stocks listed on United States securities exchanges such as The NASDAQ Stock Market LLC, The Nasdaq Global Select Market, and others.

71.     Each Defendant played a crucial role in Nonko's brokerage operations, with respect to both real and fictitious securities transactions that Nonko effected for its customers.

72.     Chamroonrat, in his role as the head of Nonko, had the ultimate authority over Nonko's financial accounts and marketing materials and, among other things, approved marketing materials that described Nonko as a trading firm; handled customers' funds and securities; extended credit; received transaction-based compensation in the form of per-share commissions; and directly solicited some of the investors to trade through Nonko.

73.     Avnon, as alleged above, worked closely with Chamroonrat on all aspects of Nonko's operations, including formulating Nonko's strategy, responding to customer inquiries, and managing the back office and accounting systems.  Avnon also used his trader training business G6 to solicit investors for Nonko, including those residing in the United States.  In addition, Avnon often distributed to Plumer lists of marketing "leads" – names and contact details of investors for Plumer to solicit to trade through Nonko.  Those lists routinely included numerous investors in the United States.

74.     Armon supported Nonko's brokerage operations by, among other things, soliciting investors and marketing affiliates directly and through G6; providing marketing "leads" for Plumer to pursue; helping test the Logix training platform; and responding to certain customer inquiries.

75.     G6 operated as the training and marketing branch of Nonko, soliciting investors for Nonko through its online trader training business.  In communicating with investors about their Nonko "accounts," Avnon and Armon often did so under G6's name.

76.     Plumer solicited investors to trade through Nonko and also participated in order routing, by providing customers with access to a trading platform (real or fictitious) and handling

customers' order-related inquiries and concerns, all for trading U.S. securities in the U.S. securities markets.

## FIRST CLAIM FOR RELIEF
### Violations and Aiding and Abetting Violations of
### Section 17(a) of the Securities Act
### (Against All Defendants)

77.     Paragraphs 1 through 76 are incorporated by reference as if fully set forth herein.

78.     By virtue of the foregoing, each of Chamroonrat, Avnon, Armon, G6, and Plumer, directly or indirectly, singly or in concert with others, by use of the means or instruments of transportation or communication in interstate commerce, or of the mails, in the offer or sale of securities:  (1) employed devices, schemes, or artifices to defraud; (2) obtained money or property by means of untrue statements of material fact or omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (3) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchasers.

79.     By virtue of the foregoing, each of Chamroonrat, Avnon, Armon, G6, and Plumer violated and, unless restrained and enjoined, will continue violating, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

80.     By virtue of the foregoing, each of Chamroonrat, Avnon, Armon, G6, and Plumer also knowingly or recklessly provided substantial assistance to persons who, directly or indirectly, singly or in concert with others, by use of the means or instruments of transportation or communication in interstate commerce, or of the mails, in the offer or sale of securities:  (1) employed devices, schemes, or artifices to defraud; (2) obtained money or property by means of untrue statements of material fact or omissions to state material facts necessary in order to make

the statements made, in light of the circumstances under which they were made, not misleading;

and (3) engaged in transactions, practices, or courses of business which operated or would

operate as a fraud or deceit upon the purchasers.

81.      By virtue of the foregoing, each of Chamroonrat, Avnon, Armon, G6, and Plumer

aided and abetted and, unless restrained and enjoined, will continue aiding and abetting,

violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], in violation of Section

15(b) of the Securities Act [15 U.S.C. § 77o(b)].

**SECOND CLAIM FOR RELIEF**
**Violations and Aiding and Abetting Violations of**
**Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder**
**(Against All Defendants)**

82.      Paragraphs 1 through 76 are incorporated by reference as if fully set forth herein.

83.      By virtue of the foregoing, each of Chamroonrat, Avnon, Armon, G6, and Plumer,

directly or indirectly, singly or in concert with others, in connection with the purchase or sale of

a security, with scienter, used the means or instrumentalities of interstate commerce, or of the

mails, or of a facility of a national securities exchange to:  (1) employ devices, schemes, or

artifices to defraud; (2) make untrue statements of a material fact or to omit to state material facts

necessary in order to make the statements made, in the light of the circumstances under which

they were made, not misleading; and (3) engage in acts, practices, or courses of business which

operated or would operate as a fraud or deceit upon others.

84.      By virtue of the foregoing, each of Chamroonrat, Avnon, Armon, G6, and Plumer

violated and, unless restrained and enjoined, will continue violating, Section 10(b) of the

Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

85.      By virtue of the foregoing, each of Chamroonrat, Avnon, Armon, G6, and Plumer

also knowingly or recklessly provided substantial assistance to persons who, directly or

23

indirectly, singly or in concert with others, in connection with the purchase or sale of a security, with scienter, used the means or instrumentalities of interstate commerce, or of the mails, or of a facility of a national securities exchange to: (1) employ devices, schemes, or artifices to defraud; (2) make untrue statements of a material fact or to omit to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (3) engage in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon others.

86.     By virtue of the foregoing, each of Chamroonrat, Avnon, Armon, G6, and Plumer aided and abetted and, unless restrained and enjoined, will continue aiding and abetting, violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], in violation of Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)].

### THIRD CLAIM FOR RELIEF
**Violations and Aiding and Abetting Violations of
Section 15(a)(1) of the Exchange Act
(Against All Defendants)**

87.     Paragraphs 1 through 76 are incorporated by reference as if fully set forth herein.

88.     By virtue of the foregoing, each of Chamroonrat, Avnon, Armon, G6, and Plumer, in connection with Nonko's operations, made use of the mails or any means or instrumentality of interstate commerce to effect any transactions in, or to induce or attempt to induce the purchase or sale of, securities (other than an exempted security or commercial paper, bankers' acceptances, or commercial bills) without being registered with the Commission in accordance with Section 15(b) of the Exchange Act [15 U.S.C. § 78o(b)], and without complying with any exemptions promulgated pursuant to Section 15(a)(2) of the Exchange Act [15 U.S.C. § 78o(a)(2)].

89.     By virtue of the foregoing, each of Chamroonrat, Avnon, Armon, G6, and Plumer violated and, unless restrained and enjoined, will continue violating, Section 15(a)(1) of the Exchange Act [15 U.S.C. § 78o(a)(1)].

90.     By virtue of the foregoing, each of Chamroonrat, Avnon, Armon, G6, and Plumer also knowingly or recklessly provided substantial assistance to persons who, in connection with Nonko's operations, made use of the mails or any means or instrumentality of interstate commerce to effect any transactions in, or to induce or attempt to induce the purchase or sale of, securities (other than an exempted security or commercial paper, bankers' acceptances, or commercial bills) without being registered with the Commission in accordance with Section 15(b) of the Exchange Act [15 U.S.C. § 78o(b)], and without complying with any exemptions promulgated pursuant to Section 15(a)(2) of the Exchange Act [15 U.S.C. § 78o(a)(2)].

91.     By virtue of the foregoing, each of Chamroonrat, Avnon, Armon, G6, and Plumer aided and abetted and, unless restrained and enjoined, will continue aiding and abetting, violations of Section 15(a)(1) of the Exchange Act [15 U.S.C. § 78o(a)(1)], in violation of Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)].

## FOURTH CLAIM FOR RELIEF
### Violation of Section 20(b) of the Exchange Act
### (Against All Defendants)

92.     Paragraphs 1 through 76 are incorporated by reference as if fully set forth herein.

93.     By virtue of the foregoing, each of Chamroonrat, Avnon, Armon, G6, and Plumer, in connection with Nonko's operations, directly or indirectly, through or by means of other persons, including Nonko's marketing affiliates, engaged in acts that would have been unlawful for each of Chamroonrat, Avnon, Armon, G6, and Plumer to do himself or itself under Sections

10(b) and 15(a)(1) of the Exchange Act [15 U.S.C. §§ 78j(b), 78o(a)(1)] and Rule 10b-5

thereunder [17 C.F.R. § 240.10b-5]; including:

      a.      directly or indirectly, singly or in concert with others, in connection with the purchase or sale of a security, with scienter, used the means or instrumentalities of interstate commerce, or of the mails, or of a facility of a national securities exchange to: (1) employ devices, schemes, or artifices to defraud; (2) make untrue statements of a material fact or to omit to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (3) engage in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon others;

      b.      made use of the mails or any means or instrumentality of interstate commerce to effect any transactions in, or to induce or attempt to induce the purchase or sale of, securities (other than an exempted security or commercial paper, bankers' acceptances, or commercial bills) without being registered with the Commission in accordance with Section 15(b) of the Exchange Act [15 U.S.C. § 78o(b)], and without complying with any exemptions promulgated pursuant to Section 15(a)(2) of the Exchange Act [15 U.S.C. § 78o(a)(2)].

94.      By virtue of the foregoing, each of Chamroonrat, Avnon, Armon, G6, and Plumer violated, and, unless restrained and enjoined, will continue violating, Section 20(b) of the Exchange Act [15 U.S.C. § 78t(b)].

## FIFTH CLAIM FOR RELIEF
### Relief Defendant Liability
### (Against NKO)

95.   Paragraphs 1 through 76 are incorporated by reference as if fully set forth herein.

96.   Relief Defendant NKO received ill-gotten gains from the Nonko scheme, as Defendants and their associates directed victims of the Nonko fraud to send their deposits to a bank account in NKO's name.

97.   Relief Defendant NKO has no legitimate claim to the ill-gotten gains from the Nonko scheme.

98.   By virtue of the foregoing, Relief Defendant NKO should be required to disgorge the amounts that it received from the victims of the Nonko fraud.


## PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests that this Court enter a Final Judgment:

### I.

Permanently restraining and enjoining each of Chamroonrat, Avnon, Armon, G6, and Plumer and their respective officers, agents, servants, employees and attorneys and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise from violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)] and Sections 10(b) and 15(a)(1) of the Exchange Act [15 U.S.C. §§ 78j(b), 78o(a)(1)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], including, as to the Exchange Act provisions, against committing any such violations directly or indirectly through or by means of another person, as prohibited by Section 20(b) of the Exchange Act [15 U.S.C. § 78t(b)].

II.

Ordering each of Chamroonrat, Avnon, Armon, G6, and Plumer to disgorge, with prejudgment interest, all ill-gotten gains from the conduct alleged in this Amended Complaint, on a joint and several basis with each other and on a joint and several basis with Relief Defendant NKO to the extent that NKO received ill-gotten gains from the alleged conduct.

III.

Ordering Relief Defendant NKO to disgorge, with prejudgment interest, all ill-gotten gains it received from the conduct alleged in this Amended Complaint, on a joint and several basis with Chamroonrat, Avnon, Armon, G6, and Plumer.

IV.

Ordering each of Chamroonrat, Avnon, Armon, G6, and Plumer to pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

V.

Granting such other and further relief as this Court may deem just and proper.

Dated: New York, New York
       May 11, 2017

*Joseph G. Sansone*
Joseph G. Sansone
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
Brookfield Place
200 Vesey Street, Suite 400
New York, New York 10281-1022
(212) 336-0103 (Suh)
suhs@sec.gov


Of Counsel:
Simona K. Suh
Barry P. O'Connell

28

## <u>LOCAL CIVIL RULE 11.2 CERTIFICATION</u>

Pursuant to Local Civil Rule 11.2, I certify that the matter in controversy alleged against the Defendants and the Relief Defendant in the foregoing Amended Complaint is not the subject of any other civil action pending in any court, or of any pending arbitration or administrative proceeding.  Related criminal cases against defendants Naris Chamroonrat, Avnon, and Armon are currently pending before this Court.

SECURITIES AND EXCHANGE COMMISSION

By:  _Joseph G. Sansone_____
    Joseph G. Sansone
    Brookfield Place
    200 Vesey Street, Suite 400
    New York, New York 10281-1022
    (212) 336-0103 (Suh)
    suhs@sec.gov

<u>Of Counsel:</u>
Simona K. Suh
Barry P. O'Connell

## DESIGNATION PURSUANT TO LOCAL CIVIL RULE 101.1(f)

Per the requirements of Local Civil Rule 101.1(f), the undersigned hereby designates the

United States Attorney for the District of New Jersey to receive service of all notices or papers in

this action at the following address:

> Catherine R. Murphy
> Assistant U.S. Attorney
> United States Attorney's Office, Civil Division
> District of New Jersey
> 970 Broad Street, Ste. 700
> Newark, New Jersey 07102

SECURITIES AND EXCHANGE COMMISSION

By:     _Joseph G. Sansone_
         Joseph G. Sansone
         Brookfield Place
         200 Vesey Street, Suite 400
         New York, New York 10281-1022
         (212) 336-0103 (Suh)
         suhs@sec.gov

Of Counsel:
Simona K. Suh
Barry P. O'Connell